[No. 35740-2-II.   Division Two.   April 1, 2008.]

EDDIE BLOOR ET AL., *Respondents*, v. ROBERT A. FRITZ ET AL., *Appellants*.

*Brandi L. Adams* (of *Demco Law Firm, PS*); and *Michael A. Lehner* and *Carl R. Rodrigues* (of *Lehner & Rodrigues, PC*), for appellants.

*Thomas C. Althauser* and *Todd S. Rayan* (of *Olson Althauser Samuelson & Rayan, LLP*), for respondents.

¶1 ARMSTRONG, J. — Eddie and Eva Bloor purchased a home from Robert and Charmaine Fritz through Lance Miller, an agent at LC Realty, Inc. After learning that the home was contaminated by a methamphetamine lab, the Bloors sued the Fritzes; Miller; LAM Management, Inc.; LC Realty; and Cowlitz County.[1] The trial court found that the Fritzes negligently misrepresented the condition of the property and that Miller failed to disclose a known material fact about the property and negligently misrepresented its condition, thereby violating the Consumer Protection Act (Act), chapter 19.86 RCW. Miller and LC Realty argue that substantial evidence does not support the trial court's findings that Miller knew of the illegal drug manufacturing on the property and failed to disclose it; they also argue that the Bloors failed to prove an Act violation. The Fritzes argue that the trial court erred in (1) failing to dismiss the negligent misrepresentation claim and (2) rescinding the real estate purchase and sale agreement. The Fritzes and Miller both challenge the trial court's damage and attorney fee awards. We hold that the trial court erred in calculating damages in conjunction with rescinding the contract, specifically by granting the Bloors more damages than neces-

---

[1] Cowlitz County does not appeal.

sary to restore them to their precontract position. Otherwise, we find no error and, thus, affirm.

## FACTS

¶2 Robert Fritz owned a home and approximately five acres of land on Spirit Lake Highway in Cowlitz County. He and his wife, Charmaine, moved from the home in 2001 and hired LAM Management to manage the property as a rental. Lance Miller and Jayson Brudvik are co-owners and operators of LAM. Miller and Brudvik are also licensed real estate agents for LC Realty.

¶3 In January 2004, Jason and Charles Waddington, Pam Jackson, and Sarah Holton occupied the Spirit Lake property under a rental agreement through LAM. On January 30, the Cowlitz-Wahkiakum Joint Narcotics Task Force executed a search warrant at the property. Task force members discovered a marijuana growing operation in the house's basement and implements of methamphetamine manufacturing on and under the house's rear deck and in a hot tub on the deck. Although the task force processed the site as a methamphetamine lab, no one from the task force or any other law enforcement agency notified the Cowlitz County Health Department, the Washington State Department of Health, or any other state agency of the methamphetamine lab. The State charged Jason Waddington with manufacturing marijuana and Charles Waddington with manufacturing methamphetamine.

¶4 On January 31, the task force issued a press release that identified the Spirit Lake property as the site of the drug search, identified the people involved, and stated that the task force had removed a marijuana growing operation and implements of a small methamphetamine lab from the property. On February 1, the *Longview Daily News* published an article that reported the information in the press release.

¶5 Charmaine learned of the police activity at the property and contacted numerous law enforcement agencies to

find out what had occurred at the property. On February 2, she contacted the task force and spoke with Judy Connor, the support staff specialist. Connor told Charmaine that the police had arrested people on the property and that the task force had confiscated a marijuana grow operation and implements of a methamphetamine lab.

¶6 The following day, Charmaine spoke with Detective Darren Ullmann, a member of the task force who had been present at the search. Ullmann told Charmaine that the task force had removed implements of a methamphetamine lab from the property. Charmaine shared this information with Robert. Miller also contacted law enforcement to learn the status of the property and the arrests in the first few days of February.

¶7 LAM initiated eviction proceedings against the Waddington tenants, and they left the property in February or March 2004. LAM subsequently re-rented the property for a short period of time but evicted those tenants in May 2004. The Fritzes then decided to sell the property.

¶8 In preparation for the sale, the Fritzes cleaned the house, painted it, and changed the floor coverings. During this time, Charmaine spoke with John and Jenae Cyr, who lived across the street from the property. Charmaine told the Cyrs that she and her husband felt they were lucky that the Waddington tenants had not cooked methamphetamine inside the house but had cooked it only on the back porch.

¶9 Eddie and Eva Bloor moved to Cowlitz County from Missouri in 2004 and began looking for a home to purchase. Brudvik showed them the Spirit Lake property. The Bloors decided to make an offer to buy the property. Miller represented both the Fritzes and the Bloors in the transaction.

¶10 Robert completed a seller's disclosure statement in which he represented that the property had never been used as an illegal drug manufacturing site. Miller reviewed the disclosure statement with the Bloors, but he did not disclose that the drug task force had discovered a marijuana grow operation or methamphetamine lab on the

property. The Fritzes accepted the Bloors' offer and the transaction closed in August 2004. The Bloors moved into the home shortly thereafter.

¶11 In September, the Bloors' son heard from a member of the community that the property was known as a "drug house." Clerk's Papers (CP) at 20. The Bloors began investigating and found an on-line version of the February 1 *Daily News* article. Eva contacted the task force, where Sergeant Kevin Tate confirmed that the task force had confiscated a methamphetamine lab at the property. She then contacted the Cowlitz County Health Department, where Audrey Shaver confirmed that nobody had reported the lab to the health department and that it would investigate the matter to determine what action it would take.

¶12 On October 22, Shaver told the Bloors that the health department had determined that the property was contaminated by the methamphetamine manufacturing and was not fit for occupancy. She told the Bloors that they could not remove their personal property from the house because of the risk of cross-contamination. The Bloors left the residence as instructed, leaving nearly all their personal belongings in the house and garage.

¶13 The health department posted an order prohibiting use of the property. The order stated that the Bloors were financially responsible for the cost of remediation, that a certified decontamination contractor would have to perform the remediation, and that use of the property was subject to criminal charges. Occupancy of buildings contaminated by methamphetamine manufacturing is dangerous to the health and safety of occupants.

¶14 The Bloors stayed with relatives until they could secure a place to live, eventually moving to Spokane. They had to repurchase clothing, bedding, furniture, and other necessities. They were unable to both support themselves and make their monthly mortgage payments. The Bloors experienced emotional distress and anxiety due to the loss of their home, personal effects, and keepsakes.

¶15 The Bloors sued the Fritzes, Miller, LAM Management,[2] LC Realty, and Cowlitz County. After a bench trial, the trial court ruled for the Bloors, awarding them damages jointly and severally against all the defendants for emotional distress, loss of personal property, loss of income, loss of use of the property, and damage to the Bloors' credit. It also awarded the Bloors $10,000.00 as punitive damages and $13,907.30 for attorney fees against Miller and LC Realty under the Act. It ordered the contract between the Bloors and the Fritzes rescinded, requiring the Fritzes to pay the Bloors' lender the purchase price, accrued interest, late charges, and foreclosure fees, and the Bloors to return the property to the Fritzes. Finally, the trial court awarded the Bloors $18,975.55 in expenses against the Fritzes and, applying a 1.2 multiplier, $125,335.25 in attorney fees against the Fritzes, Miller, and LC Realty; it awarded the Bloors their statutory costs against all defendants.

¶16 Miller and LC Realty (collectively Miller) principally argue that (1) insufficient evidence supports the trial court's findings that Miller knew about the methamphetamine lab, (2) the trial court erred in finding that he violated the Act, and (3) the trial court erred in awarding attorney fees with a multiplier and all the Bloors' litigation expenses. In addition to joining Miller in several claimed errors, the Fritzes principally argue that (1) the economic loss rule precludes the Bloors from seeking damages for the tort of negligent misrepresentation, (2) the trial court erred in rescinding the contract rather than awarding damages, and (3) the trial court erred in awarding damages for emotional distress, income loss, and injury to the Bloors' credit ratings. We hold that the trial court erred only in awarding the Bloors damages beyond those necessary to restore them to their precontract position.

---

[2] The trial court dismissed LAM with prejudice.

## ANALYSIS

### MILLER AND LC REALTY'S APPEAL

### I. KNOWLEDGE OF METHAMPHETAMINE MANUFACTURING

¶17 Miller argues that substantial evidence does not support the trial court's findings regarding his knowledge of the methamphetamine manufacturing at the Spirit Lake property.

¶18 He assigns error to the following findings of fact:

### X.

Jayson Brudvick [sic] saw the article published in the Longview Daily News on Sunday, February 1, 2004, and contacted the Fritzes by telephone to notify them and to get instructions on how to proceed with respect to evicting the tenants.

. . . .

### XVI.

During the first few days of February 2004, Lance Miller contacted law enforcement regarding the status of the Property and the arrests that were made at the Property. During his contact, Lance Miller was informed of the marijuana grow operation and the discovery of the meth lab. The denial by Lance Miller that he was informed of the discovery of the implements used in meth manufacturing on the Property is not credible.

. . . .

### LIX.

Lance Miller listed the Property and entered it on the multiple listing service. He also showed the Property to another prospective buyer, all without revealing the history of illegal drug manufacturing at the Property. Miller knew of the history of illegal drug manufacturing at the Property from one

or all three of his contacts with Jayson Brudvik from his report of the article in the newspaper, from Charmaine Fritz relative to her contacts with the Task Force, and from his personal contact with law enforcement. Miller also knew from his prior involvement with property that had been contaminated by meth manufacture of the danger of contamination with toxic chemicals from such operations. The denial by Miller of his knowledge of the history of illegal drug manufacturing at the Property is not credible.

. . . .

## LXI.

Miller concealed his knowledge that the Property had been used for illegal drug manufacturing when he announced his listing of the Property, and during his marketing of the Property for the Fritzes. Miller knew of the history of illegal drug manufacturing and of the potential contamination, knew that the Fritzes had not disclosed it on their Disclosure Statement, and failed to disclose his personal knowledge of the history of use of the Property for illegal drug manufacturing, or of the potential contamination of the Property to the public, to a prospective buyer of the Property that was interested in the Property at the same time as the Bloors, or to the Bloors.

## LXII.

The Bloors were damaged by Miller's failure to disclose the history of drug manufacturing at the Property. As shown by the investigation made by Eva Bloor upon receiving information that drug activity had occurred at the Property, Miller's failure to disclose his knowledge of the drug activity on the Property to the Bloors misled the Bloors and deprived them of essential information needed by them to learn of the true condition of the Property. Had Miller revealed his knowledge of the drug activity on the Property, the Bloors would have probably made inquiry to law enforcement and the health department, which they did upon receiving information of the history of such activity at the Property.

CP at 15, 17, 29-31.

■ ¶19 Where the trial court has weighed the evidence, our review is limited to determining whether substantial evidence supports the trial court's findings and, if so, whether the findings in turn support the conclusions of law and the judgment. *City of Tacoma v. State*, 117 Wn.2d 348, 361, 816 P.2d 7 (1991). Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the finding. *Fred Hutchinson Cancer Research Ctr. v. Holman*, 107 Wn.2d 693, 712, 732 P.2d 974 (1987). If the evidence satisfies this standard, we will not substitute our judgment for the trial court's, even though we may have resolved disputed facts differently. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003).

¶20 Miller argues that no evidence supports finding of fact X: that Brudvik read the February 1 *Longview Daily News* article about the search at the Spirit Lake property. He points out that Brudvik did not testify about the date of the article he read or identify the February 1 article as the article he read. Brudvik testified that he read in the *Longview Daily News* that there was a "marijuana bust" at the property.[3] Report of Proceedings (RP) at 714. Although he did not recall all the details from the article, he testified that he read the entire article, that he read it over a weekend, and that he recognized the names reported in the article. He testified that he contacted the Fritzes within a couple of days to discuss evicting the tenants. The February 1 article was published on a Sunday and it named the three residents who had been arrested, Jason and Charles Waddington and Sarah Holton. Robert testified that Brudvik called him on Monday, February 2, to discuss the newspaper article. This is substantial evidence to support a finding that Brudvik read the February 1 *Longview Daily News* article.

¶21 Miller next contends that no evidence supports finding of fact XVI: that law enforcement told Miller about

---

[3] As with much of their evidence, the Bloors presented Brudvik's deposition testimony at trial, but they did not call Brudvik to testify.

discovering the methamphetamine lab and that Miller's denial that he received this information was not credible. He argues that law enforcement's failure to report the lab to the health department lends credibility to his assertion that no law enforcement officer told him of the lab. He notes that no law enforcement officer testified about informing Miller, Brudvik, or LC Realty about discovering the lab; nor was there evidence that he received a copy of a police report describing the search and arrests.

¶22 Miller testified that he asked a law enforcement officer whether methamphetamine manufacturing had occurred on the property and the officer said it had not. But officers involved in the search testified that they would not have told someone there was no methamphetamine manufacturing on the property when they did in fact find implements of a methamphetamine lab. The trial court, as the finder of fact, determines disputed facts by weighing the credibility of witnesses' testimony. *Bartel v. Zucktriegel*, 112 Wn. App. 55, 62, 47 P.3d 581 (2002). We will not disturb a trial court's credibility determinations on appeal. *Bartel*, 112 Wn. App. at 62. The trial court did not believe that a law enforcement officer would deny the existence of a known methamphetamine lab when asked about it directly. The officers' testimony provides substantial support for this finding.

¶23 Miller next argues that no evidence supports finding of fact LIX: that Miller knew of the history of illegal drug manufacturing on the property from his contacts with Brudvik, Charmaine, and law enforcement and that his testimony to the contrary was not credible. He again asserts that he did not learn of the methamphetamine manufacturing from law enforcement and that Brudvik did not learn of it from the news article. Miller also argues that there is no evidence Charmaine told him about illegal drug manufacturing, pointing to her testimony that she did not tell either Miller or Brudvik about methamphetamine lab activity on the property.

¶24 We have, however, already rejected Miller's challenges to the trial court's findings that Miller and Brudvik learned of the methamphetamine lab in the days following its discovery. And the trial court did not believe Charmaine's testimony that she did not know about the methamphetamine lab. Miller testified that he discussed what Charmaine had learned from the task force with Brudvik. Substantial evidence also supports this finding.

¶25 Miller next argues that no evidence supports finding of fact LXI: that he knew the Fritzes did not disclose that the property had been used as an illegal drug manufacturing site in their seller's disclosure statement and that he did did not disclose his personal knowledge to the contrary.

¶26 But Miller testified that he saw that Robert had marked "no" in response to the question asking if the property had been used as an illegal drug manufacturing site. RP at 765-66. And he does not challenge the trial court's finding that, when he reviewed the seller's disclosure statement with the Bloors, he did not disclose the history of the task force search or the discovery of the marijuana grow operation and methamphetamine lab implements. Unchallenged findings are verities on appeal. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 42, 59 P.3d 611 (2002). Given the finding that Miller knew of the methamphetamine manufacturing on the property, substantial evidence supports a finding that he failed to disclose this knowledge to the Bloors.

¶27 Finally, Miller contends that no evidence supports finding of fact LXII: that his failure to disclose his knowledge of the history of illegal drug manufacturing at the property damaged the Bloors because it misled them and deprived them of information they needed to learn of the property's true condition. He points out that the purchase and sale agreement included a provision for a neighborhood inspection and that information about the task force search and drug arrests was readily available in the public record.

¶28 Eva Bloor testified that, if the Fritzes had disclosed the illegal drug manufacturing at the home, she might have

changed her mind about buying the property. She would have asked questions about the drug manufacturing, including what the drug was. She also would have inquired with the health department. That the Bloors began investigating the property's history as soon as they learned of the illegal drugs supports a finding that if they had known earlier, they would have investigated before closing the purchase. Again, substantial evidence supports this finding of fact.

## II. Failure To Disclose a Material Fact

¶29 Miller next argues that the trial court erred in concluding that he failed to disclose his knowledge of the methamphetamine manufacturing as RCW 18.86.030 requires.

¶30 Under RCW 18.86.030(1)(d), a real estate agent has a duty to disclose "all existing material facts known by the [agent] and not apparent or readily ascertainable to a party; provided that this subsection shall not be construed to imply any duty to investigate matters that the [agent] has not agreed to investigate." A "material fact" is "information that substantially adversely affects the value of the property or a party's ability to perform its obligations in a real estate transaction, or operates to materially impair or defeat the purpose of the transaction." RCW 18.86.010(9). But that a property is or was the site of "illegal drug activity . . . not adversely affecting the physical condition of or title to the property is not a material fact." RCW 18.86.010(9).

¶31 Miller bases his argument solely on his contention that he did not know of the methamphetamine manufacturing on the property. He does not assign error to the trial court's conclusion that methamphetamine manufacturing is a material fact that a real estate agent has a duty to disclose. Because substantial evidence supports the trial court's finding that Miller knew of the methamphetamine manufacturing on the property, and that finding supports a

conclusion that Miller violated his duty to disclose known material facts about the property, Miller's argument fails. The trial court did not err in concluding that Miller violated RCW 18.86.030.[4]

### III. Negligent Misrepresentation

¶32 Miller contends that the trial court erred in concluding that his failure to disclose the history of illegal drug manufacturing on the property was a negligent misrepresentation.

¶33 A plaintiff claiming negligent misrepresentation must prove by clear, cogent, and convincing evidence that (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages. *Lawyers Title Ins. Corp. v. Baik*, 147 Wn.2d 536, 545, 55 P.3d 619 (2002).

¶34 Miller again relies on his assertion that he did not know of the illegal drug manufacturing on the property to argue that he was not negligent in communicating the false information to the Bloors. Again, as with his argument under RCW 18.86.030, because substantial evidence supports the trial court's finding that Miller knew of the illegal drug manufacturing on the property, and Miller does not claim that he disclosed the drug problem to the Bloors, Miller's argument fails.

¶35 Miller points out that, under RCW 18.86.030(2), a real estate agent owes no duty to independently verify the

---

[4] Miller also argues that the trial court erred in concluding that he failed to disclose a material fact without making a finding that the manufacture of marijuana is a material fact under RCW 18.86.010(9). Because the court found, however, that the manufacture of methamphetamine is a material fact that Miller failed to disclose, such a finding was not necessary.

accuracy or completeness of a party's statement unless otherwise agreed. But because Miller actually knew of the illegal drug manufacturing, this standard does not apply. The trial court did not err in concluding that Miller negligently misrepresented a material fact in failing to disclose the illegal drug manufacturing on the property.

## IV. CONSUMER PROTECTION ACT

¶36 Miller next argues that the trial court erred in concluding that he violated the Act.

██ ██ ¶37 Under the Act, "unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. RCW 19.86.020. To prevail in a private claim under the Act, a plaintiff must establish five elements: (1) unfair or deceptive act or practice (2) occurring in trade or commerce, (3) public interest impact, (4) injury to plaintiff in his or her business or property, and (5) causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986). Whether particular actions give rise to a violation of the Act is a question of law that we review de novo. *Svendsen v. Stock*, 143 Wn.2d 546, 553, 23 P.3d 455 (2001). Miller contends that the trial court erred in concluding that his conduct was unfair or deceptive and that it impacted a public interest. He argues that the Fritzes' home sale was an isolated incident and that his conduct during the sale did not affect anyone other than the parties to the contract.

██ ██ ¶38 To show that a party has engaged in an unfair or deceptive act or practice, a plaintiff "need not show that the act in question was *intended* to deceive, but that the alleged act had the *capacity* to deceive a substantial portion of the public." *Hangman Ridge*, 105 Wn.2d at 785 (citing *State v. Ralph Williams' Nw. Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 553 P.2d 423 (1976)). Miller does not dispute that he advertised the property for sale to the public by listing it in the multiple listing service directory and placing a for sale sign on the property. He also showed the

property to another prospective buyer before the Fritzes accepted the Bloors' offer. Miller did not disclose the history of illegal drug manufacturing on the property to the Bloors or the other prospective purchaser, or on the multiple listing service directory. Listing and showing the property without disclosing its history of illegal drug manufacturing had the capacity to deceive any member of the public who used the directory or expressed interest in the property.

¶39 Miller also argues that the trial court erred in concluding that his conduct impacted the public interest because this is a private dispute with no likelihood that additional plaintiffs have been or will be injured in the same way. But, while it may be more difficult for a plaintiff to show a public impact from a private dispute, a dispute between a real estate agent and a property purchaser may have a public impact.

¶40 In *Svendsen*, the court considered the effect of the seller disclosure statute on a real estate agent's liability under the Act. In that case, the seller's agent knew of flooding problems on the property. *Svendsen*, 143 Wn.2d at 551-52. Yet she instructed the seller to conceal the problem in the seller disclosure form, and she also fraudulently concealed her own knowledge. *Svendsen*, 143 Wn.2d at 550-52. The court first noted that several cases decided before adoption of the seller disclosure statute had held that "an agent's failure to disclose a known material defect in the sale of real property is a violation of the [Act]." *Svendsen*, 143 Wn.2d at 556 (citing *McRae v. Bolstad*, 101 Wn.2d 161, 676 P.2d 496 (1984); *Robinson v. McReynolds*, 52 Wn. App. 635, 762 P.2d 1166 (1988); *Luxon v. Caviezel*, 42 Wn. App. 261, 710 P.2d 809 (1985)). The court concluded that the seller disclosure statute did not change this rule but, instead, preserved a cause of action under the Act where it exists independent of the seller disclosure statement. *Svendsen*, 143 Wn.2d at 558.

¶41 The court then considered whether the buyer had established the public interest element. It addressed the following factors: (1) whether the acts were committed

in the course of defendant's business, (2) whether the defendants advertised to the public, (3) whether the defendant actively solicited the plaintiff, and (4) whether the parties occupied unequal bargaining positions. *Svendsen*, 143 Wn.2d at 559 (citing *Hangman Ridge*, 105 Wn.2d at 790-91). If present, these factors show a likelihood that additional plaintiffs have been or will be injured in the same manner. *Hangman Ridge*, 105 Wn.2d at 790-91. No single factor is dispositive, nor is it necessary that a buyer prove all factors. *Hangman Ridge*, 105 Wn.2d at 791. The *Svendsen* court concluded that the buyer had established a public interest impact. *Svendsen*, 143 Wn.2d at 559.

¶42 Here, Miller, acting as a real estate agent, failed to disclose a known material fact, a history of illegal drug manufacturing, in the sale of the property to the Bloors. His conduct occurred in the course of his business of offering residential property for sale to the public. He advertised the property for sale to the public by listing it on the multiple listing service directory and placing a for sale sign on the property. And, although he did not actively solicit the Bloors, the record shows that the parties did not occupy equal bargaining positions.[5] The trial court did not err in finding that Miller's conduct impacted a public interest.[6] These findings support the trial court's conclusion that Miller violated the Act.

THE FRITZES' APPEAL

I. NEGLIGENT MISREPRESENTATION

¶43 The Fritzes argue that the trial court erred in denying their motion to dismiss the Bloors' negligent mis-

---

[5] For example, the Bloors' initial offer was below the Fritzes' asking price, but when Miller told them that another party was interested in the property, they agreed to make a full price offer.

[6] Miller also faults the trial court for concluding that marijuana production is also illegal drug manufacturing and that Miller's denial that it is a material fact he was required to disclose was a threat to the public's health and safety. But because Miller's failure to disclose the methamphetamine manufacturing at the property was an independent basis for finding a consumer protection violation, we do not reach this issue.

representation claim, asserting that no claim exists for economic loss resulting from the sale of a residence. They assert that the Washington Supreme Court's recent decision in *Alejandre v. Bull*, 159 Wn.2d 674, 153 P.3d 864 (2007), reversed the Court of Appeals decision that the Bloors relied on below to argue to the contrary and decided this "precise issue." Br. of Appellant at 15.

¶44 The Bloors maintain, however, that the Fritzes did not raise the economic loss rule before the trial court and that, under RAP 2.5(a), we should not consider the issue. They assert that they relied on the Court of Appeals decision in *Alejandre* only for the proposition that a common law cause of action exists for failure to disclose information in a seller's disclosure statement. The Fritzes respond that they implicitly raised the economic loss rule by arguing in their motion to dismiss that the Bloors had not proved a special relationship between the parties, an element of a negligent misrepresentation claim.

¶45 The economic loss rule bars recovery for an alleged breach of tort duties where a contractual relationship exists and the losses are economic. *Alejandre*, 159 Wn.2d at 683. Economic losses are those losses arising directly from the defect, such as repair costs for defective construction. *See Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 526, 799 P.2d 250 (1990). But the economic loss rule does not bar recovery for personal injury or damage to property other than the defective property. *Alejandre*, 159 Wn.2d at 684.

¶46 Although the Fritzes argued lack of a "special relationship" in their motion to dismiss, nothing in that argument alerted the trial court that the Fritzes were also arguing the economic loss rule as a bar to the tort claim. The Fritzes were essentially arguing that the Bloors had failed to prove one element of their negligent misrepresentation claim. That argument did not include the entirely different notion that the Bloors' tort claim might be barred by the economic loss rule. We conclude that the Fritzes waived their economic loss argument by not raising it

before the trial court. RAP 2.5(a); *Better Fin. Solutions, Inc. v. Caicos Corp.*, 117 Wn. App. 899, 912-13, 73 P.3d 424 (2003).

## II. RESCISSION

¶47 The Fritzes next argue that the trial court erred in rescinding the real estate purchase and sale agreement. They maintain that rescission was inappropriate because there was not a complete failure of consideration and the cost to cure the defect was slight compared to the purchase price of the property.

¶48 Contract rescission is an equitable remedy in which the court attempts to restore the parties to the positions they would have occupied had they not entered into the contract. *Hornback v. Wentworth*, 132 Wn. App. 504, 513, 132 P.3d 778 (2006), *review granted*, 158 Wn.2d 1025 (2007). We review a trial court's decision to rescind a contract for an abuse of discretion. *Hornback*, 132 Wn. App. at 513. A court sitting in equity has broad discretion to shape relief. *Hough v. Stockbridge*, 150 Wn.2d 234, 236, 76 P.3d 216 (2003).

¶49 In their closing argument, the Bloors stated that they preferred rescission of the contract over contractual damages, and the trial court ordered rescission in its oral decision. When the parties expressed confusion as to how rescission would work, the court directed the parties to work out the details and to advise the court if they could not. The Bloors later told the trial court that the parties had concluded that rescission was not feasible because the Fritzes would be unable to return the purchase price to the Bloors. Accordingly, the Bloors requested damages for the cost of decontamination and restoration of the property instead. The Fritzes agreed with the change. Yet at the next hearing, the Fritzes told the court that they preferred rescission over contractual damages and that they were "willing and able" to go forward with rescission. RP at 1462, 1469-70. The trial court continued the hearing to allow the

Bloors to consider whether they were willing to accept rescission as their remedy. The Bloors elected to return to the rescission remedy.

¶50 Given the trial court's broad discretion in shaping an equitable remedy, we cannot say that the trial court abused its discretion in ordering rescission. The Fritzes requested rescission after the Bloors had agreed to accept contractual damages, also at the Fritzes' request. Although the Bloors' attorney expressed frustration with the Fritzes' shifting position, the Bloors agreed to return to the rescission remedy. A party cannot set up an error below and then complain of it on appeal. *Casper v. Esteb Enters., Inc.*, 119 Wn. App. 759, 771, 82 P.3d 1223 (2004). Moreover, the Fritzes did not argue before the trial court that there was not a complete failure of consideration or that the cost to remediate the property was not high enough to justify rescission. Rescinding the contract put the Bloors as close as possible to the position they would have been in had they never purchased the property. The trial court did not err in rescinding the real estate purchase and sale agreement.

¶51 The Fritzes argue in the alternative that the trial court erred in awarding the Bloors interest on the total purchase price of $149,000 and lender fees as part of the rescission remedy because to do so goes beyond restoring the parties to their original positions. They focus on the fact that the Bloors financed the entire purchase price of the property and made only one mortgage payment before they left the house due to the contamination.

¶52 The trial court ordered the Fritzes to pay the $149,000.00 purchase price; $38,555.13 of interest on the purchase price, accrued at the statutory rate of 12 percent per annum from the date the health department posted the property as unfit for habitation; and late charges and foreclosure costs of $9,231.89—a total of $196,787.02—into the court's registry. When payment to the court was complete, the court would order the funds disbursed to the Bloors' lender to satisfy the debt secured by the property with any excess funds going to the Bloors. The court would

then enter a decree quieting title to the property in the Fritzes.

¶53 Upon completing the contract, the Fritzes received the full purchase price from the Bloors' lender and the Bloors became indebted to the lender for that amount. But the Bloors did not lose the use of $149,000 by financing the purchase. Rather, the Bloors incurred $149,000 of debt to purchase the property. Thus, the Bloors were not entitled to interest on the $149,000 because they would not have had the funds to invest if the purchase had not gone through. *See Jones v. Best*, 134 Wn.2d 232, 242, 950 P.2d 1 (1998) (purpose of prejudgment interest is to compensate a party for the loss of use of money to which he was entitled). To restore the Bloors to their precontract position, the Fritzes must pay the $149,000 debt together with the unpaid interest that has actually accrued, penalties, and foreclosure costs the lender assessed against the Bloors. The Bloors are not entitled to any excess funds. After the Fritzes demonstrate that they have paid all these obligations, they are entitled to an order quieting title to the property.

## III. DAMAGES

### A. Loss of Income and Damage to Credit Rating

¶54 The Fritzes next argue that insufficient evidence supports the trial court's award of damages for loss of income and damage to the Bloors' credit rating.

¶55 They assign error to the following findings of fact:

### XLVIII.

Due to the financial burden of setting up a new household and reestablishing their lives, the Bloors were unable to make payments on the underlying indebtedness secured by the Property. As a result of the Bloors' inability to pay their loan obligations, the beneficiaries under the Deed of Trust that secured the purchase money loan to the Bloors initiated foreclosure proceedings, which proceedings were suspended on several occasions while this litigation was pending. Additional

penalties and interest have accumulated on the debts owed by the Bloors.

. . . .

## LIII.

When they purchased the Property in July 2004, the median credit score for Ed Bloor was 666 and the median credit score for Eva Bloor was 647. Due to the loss by the Bloors of their home and belongings, and their resulting inability to make the required monthly payments on their loans, as of April, 2006, Ed Bloor's credit score had fallen to 569 and Eva Bloor's credit score had fallen to 552. The cause of the difference between the credit scores in July, 2004 and the credit scores in April, 2006 was the reporting of the Property foreclosure proceedings and other associated debts that were proximately caused by the Bloors' loss of their home and belongings due to the discovery of the meth contamination.

## LIV.

Due to the reduction of the Bloors' credit scores it is reasonably certain that for at least the next ten (10) years the Bloors will suffer economic loss when they apply for credit. A reasonable estimate of the loss they will suffer from the damage to their credit scores can be made based on the increased cost they will likely than not [sic] incur to acquire and pay a home purchase loan. The reduced credit scores the Bloors now have will result in them having to pay approximately one percentage point more in interest on a home loan, which translates to a current loss of $10,000.00, when the added cost of the loan over the normal amortization period of the loan is reduced to present cash value. This loss is reasonably certain and based on reliable statistical data provided by Robert Moss, the Bloor's [sic] economic expert witness.

## LV.

Ed Bloor was unable to work for at least three months due to the contamination of the Property and the loss of his tools and equipment. His average [monthly] income prior to the discov-

ery of the contamination was $2,500.00. He lost approximately three months income and thus, his income loss due to his inability to work was $7,500.00.

CP at 26-28.

¶56 The Fritzes argue that the evidence shows that the Bloors did not have sufficient savings or income to pay their mortgage payments when the health department posted the property as unfit for habitation. They maintain that Ed Bloor's loss of income was due to the fact that he had not yet started working after moving from Missouri. And they assert that the damage to the Bloors' credit ratings was due to their poor financial condition and history of poor financial responsibility.

¶57 Ed Bloor testified that in the weeks after he moved into the house, he obtained a business license in order to start a siding business and was in the process of obtaining a bond for it. He owned all the tools necessary for siding and stored them in the garage at the Spirit Lake property. While he prepared to start his business, he performed remodeling work, earning a couple thousand dollars. But because the garage where he stored his tools was contaminated, he had to abandon his tools when he left the house and was unable to start a siding business or continue the remodeling work. Ed Bloor obtained employment in April 2005, after moving to Spokane, in a position where he did not need his siding tools. His average monthly income in Spokane was $2,500. Robert Moss, the Bloors' financial expert, testified that the average length of unemployment in Washington is three months. This evidence supports the finding that Ed Bloor lost $7,500 in income due to the contamination of the property.

¶58 In addition to leaving behind Ed Bloor's siding tools, the Bloors were unable to remove their clothing, bedding, furniture, cooking utensils, or personal items from the home. They had to replace all these items. Ed Bloor testified that they used the funds they had at the time to "try to get [their] life back to where [they] could live." RP at 370. This

evidence, along with the evidence about Ed Bloor's loss of income, supports the finding that the Bloors were unable to make the mortgage payments because of the property contamination.

¶59 The Fritzes do not dispute that the Bloors' credit ratings dropped by about 100 points each from the time they bought the house to the time of trial, but the Fritzes attribute that drop to the Bloors' history of poor financial management rather than the loss of the house. Yet the Fritzes do not explain how the Bloors' past financial mismanagement would cause a current drop in their credit ratings. The Bloors' expert testified that a 100-point drop in credit rating would cause a buyer to incur about $10,000 more in interest costs over the first seven years of a loan. The Fritzes offered nothing to rebut this testimony, which supports the finding that the drop in the Bloors' credit ratings caused the Bloors damages.

## B. Emotional Distress

¶60 The Fritzes contend that the trial court erred in awarding the Bloors damages for emotional distress, arguing that emotional distress damages are not available for rescission of a contract or breach of a contract and repeating their argument that the economic loss rule bars damages for negligent misrepresentation.

¶61 But the trial court specified that it awarded emotional distress damages as a consequence of the negligent misrepresentation, not under a contract theory. And we have already declined to consider the Fritzes' argument that the economic loss rule bars the Bloors' recovery for negligent misrepresentation.

¶62 The Fritzes do not challenge the trial court's findings of fact in support of emotional distress damages. These include that the Bloors suffered from anxiety and discomfort as a result of the loss of their home, personal effects, and keepsakes. Ed Bloor experienced symptoms of depression, his sister noticed changes in his personality, and he blamed himself for what had happened and felt like

he had let his family down. Eva Bloor also experienced anxiety, resulting in a trip to the emergency room because she thought she was having a heart attack. A doctor diagnosed her with anxiety and panic attacks and prescribed medication to reduce her anxiety. The trial court did not err in awarding emotional distress damages.

C. Litigation Expenses

¶63 The Fritzes argue that the trial court erred in awarding the Bloors their litigation expenses beyond the statutory costs allowed in RCW 4.84.010. We review a trial court's award of attorney fees and costs for abuse of discretion. *Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 169, 795 P.2d 1143 (1990).

¶64 Under RCW 4.84.010, "there shall be allowed to the prevailing party upon the judgment certain sums by way of indemnity for the prevailing party's expenses in the action, which allowances are termed costs, including, in addition to costs otherwise authorized by law, the following expenses . . . ." And in an action on a contract that specifically provides for the award of attorney fees and costs to the prevailing party, the prevailing party is "entitled to reasonable attorney's fees in addition to costs and necessary disbursements." RCW 4.84.330.

¶65 Here, the real estate purchase and sale agreement provided, "If Buyer or Seller institutes suit against the other concerning this Agreement, the prevailing party is entitled to reasonable attorney's fees and expenses." Ex. at 41. The trial court found that the term "expenses" was broader than the term "costs" and that it expressed the parties' intent to allow the prevailing party to recover all of the expenses arising from the breach of the contract or attempts to enforce the contract. The trial court ordered the Fritzes to pay the Bloors $18,975.55 in expenses. This amount included the Bloors' expert witness fees, court reporter fees, travel expenses, mediation expenses, and other expenses.

¶66 The Fritzes rely on our recent opinion in *Paradiso v. Drake*, 135 Wn. App. 329, 143 P.3d 859 (2006),

*review denied*, 160 Wn.2d 1024 (2007), to argue that the language in the real estate purchase and sale agreement entitles the Bloors only to statutory costs as defined in RCW 4.84.010. But we addressed attorney fees only in the unpublished portion of that opinion. Citation to this part of the opinion was improper. GR 14.1. Moreover, the attorney fee section of that opinion does not address any distinction between statutory costs and other expenses.

¶67 Our primary goal in interpreting a contract is to ascertain the parties' intent. *Paradise Orchards Gen. P'ship v. Fearing*, 122 Wn. App. 507, 516, 94 P.3d 372 (2004). The Fritzes do not assign error to the trial court's finding that the parties intended the term "expenses" to include costs other than those that RCW 4.84.010 defines. This finding supports the trial court's award of additional expenses under the contract.

¶68 The Fritzes also fault the trial court for failing to apportion the cost of transcribing deposition transcripts based on the portions used at trial. The Bloors' attorney stated, however, that he calculated the percentage of each deposition transcript read into the record at trial and apportioned the costs accordingly. The Fritzes did not object to the Bloors' calculation. The Fritzes cannot now complain that the trial court used the Bloors' calculation.

ATTORNEY FEES

I. SEGREGATION OF CLAIMS

¶69 The Fritzes contend that the trial court erred in awarding the Bloors their attorney fees against the Fritzes and Miller jointly and severally, arguing that the trial court should have segregated the fees it awarded for each claim, excluded fees for claims that did not give rise to an award of attorney fees, and excluded duplicative and unnecessary work.

¶70 In Washington, a party may recover attorney fees only when a statute, contract, or recognized ground

of equity permits recovery. *Panorama Vill. Condo. Owners Ass'n Bd. of Dirs. v. Allstate Ins. Co.*, 144 Wn.2d 130, 143, 26 P.3d 910 (2001). Whether a party is entitled to an award of attorney fees is a question of law that we review de novo. *Tradewell Group, Inc. v. Mavis*, 71 Wn. App. 120, 126, 857 P.2d 1053 (1993). Whether the fee award is reasonable is a matter of discretion for the trial court, which we will alter only if we find an abuse of discretion. *Scott Fetzer Co. v. Weeks*, 122 Wn.2d 141, 147, 859 P.2d 1210 (1993).

¶71 The trial court found that there was no basis to award attorney fees against Cowlitz County. But contrary to the Fritzes' assertions, the trial court excluded the time the Bloors' attorneys spent exclusively on claims against Cowlitz County from the attorney fee calculation.

¶72 A trial court may require a plaintiff to segregate its attorney fees between successful and unsuccessful claims. *Kastanis v. Educ. Employees Credit Union*, 122 Wn.2d 483, 501-02, 859 P.2d 26, 865 P.2d 507 (1993). If the claims are unrelated, the court should award only the fees attributable to the recovery. *Blair v. Wash. State Univ.*, 108 Wn.2d 558, 572, 740 P.2d 1379 (1987). But where the attorney fees for successful and unsuccessful claims are inseparable, the trial court may award the plaintiff all its fees. *Blair*, 108 Wn.2d at 572.

¶73 Although there is no finding of fact that the Bloors' claims were inseparable, the trial court stated, in considering whether to apply a lodestar enhancement, "The unsuccessful claim against LAM Management, I don't think that can really be segregated too much from what was claimed here. It would be virtually impossible to segregate that out in my view. . . . " RP at 1440. The Bloors' attorney also stated to the court that it would be "almost impossible" to segregate the time spent on the various claims. RP at 1447-48. The claims arose out of the same set of facts and involved interactions between the defendants. The trial court did not abuse its discretion in not segregating the Bloors' attorney fees.

¶74 Also contrary to the Fritzes' assertions, the trial court excluded hours that it found to be duplicative or unnecessary, including 13 hours of the time it took to draft the complaint and the hours that a second attorney spent attending depositions.

## II. LODESTAR MULTIPLIER

¶75 Finally, Miller contends that the trial court erred in applying a 1.2 multiplier to its award of attorney fees against Miller and the Fritzes, arguing that the evidence does not support the trial court's findings in support of enhancing the attorney fee award.

¶76 Miller assigns error to the following findings of fact relevant to this issue:

### LXV.

The declarations submitted by the Bloors' attorneys show that they expended over 800 hours in the prosecution of the Bloor's [sic] claims. The Bloors did not have the money to hire their attorneys and pay for their representation. The Bloors' attorneys, expecting the defendants to capitulate, accepted the representation on a contingent fee basis and, when the defendants failed to accept responsibility, the attorneys assumed significant business risk that they would not be paid. Although the Bloors paid the filing fee and some of the service fees, they were unable to pay any of the remaining expenses, and had they not prevailed at trial, the Bloors' attorneys faced substantial risk that they would not be paid their fees or the significant expenses and costs they advanced.

. . . .

### LXXIII.

The claim of damage to the Bloors' credit was a novel issue presented by the Bloors' attorneys and the claim against Cowlitz County based on its failure to comply with the requirements of reporting under RCW 64.44 *et seq.*, the contaminated properties statute, was unusual and was apparently the first

such claim against a governmental entity made under that statute.

## LXXIV.

Plaintiffs' case was legally complex with multiple legal theories presented against multiple Defendants. Plaintiffs' case was complicated by having to prove that the Fritzes and Miller had knowledge of the use of the Property for illegal drug manufacturing using circumstantial evidence.

. . . .

## LXXVI.

The many hours expended on the prosecution of the Bloors' claims necessarily precluded the Bloors' attorneys from other employment opportunities that would have otherwise been available.

. . . .

## LXXXII.

Some of the issues involved in the Bloors [sic] claims were novel. Cowlitz County is a member of the task force that conducted the search and arrests leading to the discovery of the meth lab, and task force members failed to report the discovery to the Cowlitz County Health Department, as required by law. Determining that Cowlitz County was the liable entity for such failure required careful investigation and development of the Bloors [sic] claims, and overcoming the defenses claimed by Cowlitz County, including the claim of public duty doctrine. The case was complex in that the Bloors had to prove multiple acts and omissions of the four defendants, and the Fritzes and Miller steadfastly denied their commission of such omissions and acts. The persistent resistance of the Fritzes and Miller to acknowledge liability, the time and labor required to prosecute the claims, the necessity of an expeditious resolution and time sensitivity of the claims required diligent and determined prosecution of the Bloors [sic] claims. The Bloors [sic] claims were also undesirable because of their inability to pay their attorneys, their residence in Spokane, the relative difficulty of

communication with them, and the resources the defendants were willing to expend to defend against the claims. These factors, the uncertainty of recovery and the contingent nature of the representation all support an enhancement of the attorney fees to be awarded. An enhancement based on a multiplier of 1.2 should be made to the hourly rates applied to the allowed hours expended by the Bloors' attorneys prior to the date the Court announced its oral ruling.

CP at 32, 35, 37.

¶77 Under the lodestar method of calculating an award of attorney fees, the court must first determine that counsel expended a reasonable number of hours in securing a successful recovery for the client and that the hourly rate counsel billed the client was reasonable. *Mahler v. Szucs*, 135 Wn.2d 398, 434, 957 P.2d 632, 966 P.2d 305 (1998). The court must exclude any wasteful or duplicative hours. *Mahler*, 135 Wn.2d at 434. The lodestar fee is the reasonable number of hours incurred in obtaining the successful result multiplied by the reasonable hourly rate. *Mahler*, 135 Wn.2d at 434.

¶78 The court presumes that the lodestar amount is a reasonable fee. *Henningsen v. Worldcom, Inc.*, 102 Wn. App. 828, 847, 9 P.3d 948 (2000). But in rare instances, the court may, in its discretion, adjust the lodestar amount up or down to adjust for factors that the lodestar calculation has not already taken into account. *Mahler*, 135 Wn.2d at 434; *Henningsen*, 102 Wn. App. at 847. These factors include the contingent nature of success in the case and the quality of the legal representation. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 593-94, 675 P.2d 193 (1983).

¶79 Here, the Bloors requested a 1.5 multiplier on the attorney fee award. The trial court found that the complexity of the case, the fact that it presented novel issues, the contingent nature of success, the high quality of representation, and the loss of other work made an enhancement appropriate. But because several of these fac-

tors were not relevant to the claims on which it awarded fees, it concluded that a 1.2 multiplier was appropriate.

¶80 Miller argues that there is no evidence, other than a single attorney's declaration, to support the finding that the Bloors presented novel claims and that the declaration is insufficient to support the finding.

¶81 The Bloors asked a local attorney with at least 15 years' experience in real estate matters to provide an opinion on the reasonableness of their attorney fee request. He opined that one reason to apply a lodestar multiplier was the novelty of two of the Bloors' claims, the liability of the county for failure to report the methamphetamine lab, and the damage to the Bloors' credit rating. The attorney explained that he had no prior experience with either claim. Miller points out that there is no evidence in the record that no other county has been sued for failing to report a methamphetamine lab. But the local attorney's testimony that he had no experience with such claims supports the trial court's finding that the issues were novel. In addition, Miller and the Fritzes admitted to some novelty in the Bloors' credit rating damage claim by challenging its admissibility on the basis that no court had previously allowed such testimony. Substantial evidence supports the trial court's finding.

¶82 Miller also challenges the trial court's finding that the case was complex, arguing that multiple defendants and multiple claims do not alone make a case complex. Again, the Bloors' expert opined that the case was complex. And the trial court stated,

> This was a complicated case, at least from my perspective. I find it a little unusual that the defense would say this isn't complex now when it was pretty complicated at the time. There were numerous issues here and a liability and damages portion between several parties. I viewed it as a complex case, presenting a number of issues versus different parties.

RP at 1438. The Bloors' attorneys spent more than 800 hours over 24 months to prepare the case; the parties took

6 days to try it. Three hearings were required to complete the findings of fact and conclusions of law. Together, these factors support the trial court's conclusion that the case was complex.

¶83 Miller argues that the evidence does not support a finding that recovery was uncertain, asserting that recovery against Cowlitz County was almost certain. But the trial court found that the other defendants were "steadfast in their denial of responsibility" and the lack of direct evidence against Miller and the Fritzes created "significant difficulty" in the case. CP at 32. The trial court also found that the quality of all parties' representation, including Miller's and the Fritzes', was high. Even if recovery against the county was almost certain, substantial evidence supports a finding that recovery against Miller and the Fritzes was uncertain.

¶84 Miller also challenges the trial court's finding that the many hours the Bloors' attorneys worked on the case precluded them from other employment opportunities. As noted above, the trial court found that the Bloors' attorneys spent over 800 hours working on the case over 24 months. The trial court noted that this factor takes into account whether an attorney turns down "more sure things or sure-fire payment to accept this case which is not, was not from the beginning a sure thing." RP at 1439-40. The trial court also found that the Bloors' attorneys expected the defendants to concede liability and when they did not, the attorneys had to continue with the case. Miller does not explain how the Bloors' attorneys could have worked on other cases with more certain recovery at the same time they spent over 800 hours on this case. Substantial evidence supports this finding of fact.

¶85 The trial court considered appropriate factors in considering whether to adjust the lodestar amount, and it did not abuse its discretion in deciding to apply a 1.2 multiplier.

III. Attorney Fees on Appeal

¶86 The Bloors request their attorney fees on appeal under RAP 18.1. Where a statute or contract allows an award of attorney fees at trial, an appellate court has authority to award fees on appeal. *Standing Rock Homeowners Ass'n v. Misich*, 106 Wn. App. 231, 247, 23 P.3d 520 (2001); *Reeves v. McClain*, 56 Wn. App. 301, 311, 783 P.2d 606 (1989) (citing *W. Coast Stationary Eng'rs Welfare Fund v. City of Kennewick*, 39 Wn. App. 466, 694 P.2d 1101 (1985)). The trial court awarded the Bloors their attorney fees under the real estate purchase and sale agreement and the Act. Because they have prevailed on appeal, we award the Bloors their attorney fees under RAP 18.1 in an amount to be set by a commissioner of this court.

¶87 We affirm but vacate the damage award and remand for the trial court to enter new judgment for the Bloors consistent with this opinion.

Houghton, C.J., and Quinn-Brintnall, J., concur.