# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| AVH & BJ HOLDINGS 2, LLC, a Washington limited liability corporation, | No.  51001-4-II |
| Appellant, | UNPUBLISHED OPINION |
| v. | |
| LACLARE INVESTMENTS, LLC, a Washington limited liability corporation; TIMOTHY JOHNSON COMMERCIAL PROPERTIES, a Washington limited liability corporation; TIMOTHY N. JOHNSON and JANE DOE JOHNSON, husband and wife and their marital community, | |
| Respondents. | |

BJORGEN, J.[*] — This case arises from a real estate transaction in which AVH & BJ Holdings 2, LLC (AVH) purchased commercial property from LaClare Investments LLC (LaClare).  AVH alleges that the listing broker (seller's agent)—Timothy Johnson and Timothy Johnson Commercial Properties, LLC (Johnson)[1]—failed to disclose all known existing material facts regarding the property, which AVH claims was under a threat of condemnation or similar proceedings prior to closing.

AVH argues the superior court erred when it granted summary judgment to Johnson. Specifically, AVH claims:  (1) the property was under a threat of condemnation or similar

---

[*] Judge Thomas R. Bjorgen is serving as a judge pro tempore for the Court of Appeals, pursuant to RCW 2.06.150.

[1] Johnson refers to Timothy Johnson and Jane Doe Johnson, and their marital community, and Timothy Johnson Commercial Properties LLC, collectively.

proceedings, (2) Johnson had a duty to disclose all known existing material facts under statute and the common law, (3) all existing material facts known by Johnson were not apparent or readily ascertainable, (4) Johnson violated the Consumer Protection Act (CPA), (5) Johnson committed unfair or deceptive acts, (6) Johnson's unfair and deceptive acts have a public impact, and (7) Johnson can be held personally liable for his torts and his CPA violations.

We hold that all existing material facts known by Johnson were readily ascertainable, Johnson did not commit unfair or deceptive acts, and Johnson cannot be held personally liable because he did not commit a tort or violate the CPA. Thus, we need not address any other issues raised by AVH, and we decline AVH's request for an award of attorney fees.

We affirm.

FACTS

A.    AVH's Purchase of the Property and Subsequent Sale To the Central Puget Sound Regional Transit Authority (Sound Transit)

AVH purchased commercial real property located on East 25th Street in the city of Tacoma (the Property) from LaClare. Johnson provided brokerage services to LaClare. Billy Moultrie and Tamir Ohayon provided brokerage services to AVH through NAI Puget Sound Properties.

On July 30, 2015, AVH[2] and LaClare signed a contract entitled "Commercial & Investment Real Estate Purchase & Sale Agreement" (PSA), in which AVH agreed to purchase the Property from LaClare for $1,100,000. The Property contains a long, narrow warehouse

---

[2] The buyer listed on the contract was "Jordan Moving and Storage and/or assigns" which thereafter assigned its interest to AVH.

building and is bounded by operating train tracks, Sound Transit's Tacoma Trestle, to the south and Sound Transit's Operations and Maintenance Facility (OMF) to the west.[3] East 25th Street is to the Property's north. Prior to closing, neither Moultrie nor Ohayon asked Johnson anything about the possibility of Sound Transit needing to acquire or condemn all or part of the Property or any similar proceedings. Nor did they conduct any independent research on any proposed expansion projects in the area.

Sound Transit is a regional transit authority authorized by chapter 81.112 RCW to construct and operate a high-capacity transportation system. In 1996 and in 2008, voters approved local funding to implement a regional high-capacity system for the Central Puget Sound region often referred to as ST2 or Sound Move. ST2 included funding to explore options for expanding the Tacoma Link light rail. The Tacoma Link Expansion project arose from that exploration. This expansion project extends the existing Tacoma Link light rail, includes new stations, relocates the Theater District Station, and expands Sound Transit's OMF.

On November 19, 2015, Sound Transit formally selected the Property for the OMF expansion through the adoption of Resolution No. R2015-22.

On November 23, LaClare and AVH closed the purchase by recording the statutory warranty deed.[4]

---

[3] The title reports delivered to Moutrie and Ohayon, the buyer's agents, before closing included: a survey, recorded by Sound Transit, that revealed that the Property's improvements encroached on Sound Transit's property, a construction agreement conferring Sound Transit rights to maintain portions of the building on the Property, and a temporary Street Occupancy Permit, recorded one month before closing, to facilitate a different Sound Transit project in the area.

[4] Johnson declared,

> To the best of my knowledge, around the time of the closing of the transaction, Buyers became aware that Sound Transit was interested in purchasing the Property.

On January 13, 2016, Sound Transit sent a letter to AVH via certified mail to notify it that the Board planned to acquire the property if approved by resolution.

On January 28, the Board adopted Resolution R2016-02, which authorized Sound Transit to acquire the Property, including by condemnation in the event an acceptable agreement could not be reached. At the time the Board adopted Resolution R2016-02, AVH owned the Property.

On February 3, 2017, Sound Transit acquired the Property from AVH for $1,265,000.

B.   The Complaint

On May 5, 2016, AVH filed a complaint against LaClare and Johnson alleging that LaClare and/or Johnson had information and knowledge that Sound Transit planned to acquire and/or condemn the Property in connection with its expansion projects. Against LaClare, the complaint alleged intentional misrepresentation, breach of contract, including breach of the implied duties of good faith and fair dealing, negligent misrepresentation and/or failure to disclose, and CPA violations. Against Johnson, it alleged negligent misrepresentation/failure to disclose and CPA violations.

C.   Johnson's Communications

Johnson listed the Property for sale in April 2010 and contacted several potential buyers in his capacity as the listing broker (seller's agent) for the Property. As part of that outreach, Johnson communicated primarily with Allison Gregg, Sound Transit's Community Outreach

---

Subsequently, Moultrie contacted me to inquire as to Sound Transit's interest in the Property. I responded that though Sound Transit had expressed interest in purchasing the Property, they had never taken any action on that interest by submitting a letter of interest or intent, or by even stating affirmatively that they would acquire the Property.

Clerk's Papers (CP) at 398.

Corridor Supervisor, to discuss whether Sound Transit had any interest in the Property. He surmised Sound Transit would be interested in the Property given its significant presence in the area, basing this assumption on media reports he had reviewed, public meetings he attended, and conversations and other communications he had regarding Sound Transit's expansion projects. According to Johnson, Sound Transit expressed interest in the Property, but it did not provide any additional details, literature, access to documents, or direct him to information publically available on websites.

> During Johnson's deposition, the following line of questioning took place:
>
> Q: While we're in this exhibit[5] . . . [i]t states: 'Defendant Johnson justifiably relied on statements made by others that publical[l]y-known information need not be disclosed to plaintiff.'
> Who made any statements to you to that effect?
> . . . .
> A: Seller. Rick.[6]
> Q: Mr. Burrows?
> . . . .
> A: Yes.
> Q: And what did Mr. Burrows tell you specifically as best you can recall?
> A: He said because the property was – and the Sound Transit issue was in the public and readily understood and marketed, that we didn't have to tell the buyer's broker that Sound Transit had showed some interest in the property or any other potential buyer that came before.
> Q: When? When did he tell you that?
> A: Probably somewhere between, maybe a month before closing, six weeks before closing, somewhere around there.
> Q: You had had a discussion in which you were questioning whether or not you should disclose the Sound Transit interest?
> A: Yes.
> Q: Who initiated that conversation?
> A: I did.

---

[5] The portion of the deposition in the record on appeal does not identify the exhibit.

[6] Rick Burrows was a principal at LaClare, which owned the Property, and he hired Johnson as his listing broker (seller's agent).

Q: Was it in person, on the phone, or --
A: On the phone.
Q: Were you instructed not to provide the information to Mr. Moultrie or the ultimate buyer?
A: Yes.
Q: Was that part of the reason you didn't provide any documents relating to the Sound Transit issue to the buyer?
A: No.
Q: Why didn't you provide any documents related to the Sound Transit issue to the buyer?
A: There were no documents to provide. There was no offer, there was no letter of intent, there was no . . .
Q: There were emails in your possession concerning Sound Transit's interest in acquiring the --
A: We had a lot of emails -- sorry.
Q: . . . property going back and forth concerning Sound Transit acquiring the property?
A: Yes.
Q: Why not provide those?
A: It would not be appropriate to give a list of all the . . .[7]

Clerk's Papers (CP) at 76-83, Ex. A, Dep. of Timothy N. Johnson.

In July 2014, Burrows wrote to his bank: "Tim Johnson recently received an intent to purchase warehouse 4 [the Property] from Sound Transit. I have asked Tim to contact you and discuss this possible sale." CP at 89. Johnson then advised the bank that by the end of 2014, "Sound Transit will have completed their due diligence to purchase warehouse 4 [the Property] for their [OMF] expansion of the T-Link. Apparently our site is the only viable option." CP at 87.

In December 2014, a Sound Transit representative asked Johnson for access to the Property for an inspection, and Johnson stated in an e-mail, "Please do not tell Roman [LaClare's former tenant] you are buying the building and kicking him out." CP at 92.

---

[7] The deposition testimony available in the clerk's papers ends here.

In February 2015, Johnson forwarded one of the e-mails he received from Gregg at Sound Transit to Burrows. The e-mail from Gregg advised that Sound Transit was still in the environmental review phase and that she should have more information about potential acquisitions in June. Johnson advised Burrows, "As previously mentioned, they string us out month by month. January is now June." CP at 96. Burrows replied, "This is different information than what my understanding as to what I was told and that being that it was already funded. Any idea as to what occurred?" CP at 95. Johnson replied, "It's typical of government. They know we can't sell because it is common knowledge that ST [Sound Transit] is buying it [the Property] and can be condemned so they string us along. I'll stay on it and see if we can speed them up." CP at 95. Burrows replied, "What if we were to say we have parties wanting to buy. I've never received a letter of intent, have you from ST[?] What makes them think they can keep us from selling[?]" CP at 95.

On June 29, 2015, Burrows texted Johnson: "Looks like Sound Transit got the go ahead from the legislature to go to the voters for their transit extension plan. Please check in with your contact to see when a PSA is expected on Warehouse 4." CP at 109.

On June 30, Johnson received an e-mail from Gregg regarding a "'save the date' notice for Tacoma Link Expansion's open house," to which he replied, "Is the link maintenance [building] expansion funded (LaClare)?" CP at 117. Gregg replied, "I'm not sure how the[] funding is divided up. We are still applying for grants and awaiting confirmation that we are in the President's 2016 budget. Hopefully we'll know more soon." CP at 117. Johnson replied, "It's been hard for me to sell the property in good faith and we can't sign a long-term lease and ST *might* buy it." CP at 116.

7

The record discloses several other e-mails between Johnson and Sound Transit employees—mostly Gregg—regarding its potential interest in the Property. In those e-mails, Sound Transit expressed an interest in the Property, but never represented that it would acquire the Property (including by condemnation) or discuss any potential terms of purchase.

Gregg declared, in part, as follows:

7. Prior to the adoption of Resolutions 2015-22 and 2016-02 Sound Transit engaged in substantial public outreach to inform the public about the options Sound Transit was considering for the Tacoma Link Expansion, including the OMF expansion. Our objective was to inform the general public and include the public in Sound Transit's planning process. For the Tacoma Link Expansion, this public outreach included publication of information and notices on Sound Transit's website and in newspapers, press releases, mass postcard mailing, mass emailing, notifications on list serves for professional and community organizations, multiple community meetings, and participation in fairs and festivals. The public information Sound Transit provided included maps depicting proposed locations and alternatives for the expansion project. The Tacoma Link Expansion also received ongoing news coverage throughout Sound Transit's planning process, including coverage by the Tacoma News Tribune and local television and radio news casts. . . .

8. Though Sound Transit engages in considerable public communication about expansion plans and site options and alternatives under consideration, Sound Transit representatives are not authorized to and are careful not to offer to purchase or make any commitment that Sound Transit will purchase any particular property, nor are they authorized to discuss terms of a potential purchase until after the Sound Transit Board passes a Resolution authorizing acquisition.

. . . .

11. Beyond mass mailings and publications on Sound Transit's website and in local media, I did not reach out to the owner of 824 E. 25th Street property [the Property] about the Tacoma Link Expansion or the OMF expansion. I did not initiate contact with the owner or the owner's representatives to discuss purchasing the property nor did I ever represent that Sound Transit would acquire the property or discuss terms of any potential purchase.

12. Sound Transit was contacted by the owner's broker, Tim Johnson, who made inquiries in response to the public information. I did not tell Mr. Johnson or any other representative of the property owner that Sound Transit would acquire

the property, nor could I, since the Board had not authorized acquisition at the time I was communicating with Mr. Johnson. I did inform Mr. Johnson of Sound Transit's planned process and the major milestones that would have to be achieved before Sound Transit could proceed with the OMF expansion, including environmental review, project funding and Board site selection and acquisition authorization. The information provided to Mr. Johnson was also available on the Sound Transit website.

CP at 412-14.

D.      The Purchase and Sale Agreement between LaClare and AVH

The relevant provisions of the PSA between LaClare as seller and AVH as buyer include,

in pertinent part:

5. FEASABILITY CONTINGENCY. . . .
a. Books, Records, Leases, Agreements. Seller shall make available for inspection by Buyer and its agents . . . after Mutual Acceptance [of] all documents in Seller's possession or control relating to the ownership, operation, renovation or development of the Property. . . .

. . . .

12. SELLER'S REPRESENTATIONS. Except as disclosed to or known by Buyer prior to the satisfaction or waiver of the feasibility contingency stated in Section 5 above, including in the books, records and documents made available to Buyer, or in the title report or any supplemental report or documents referenced therein, Seller represents to Buyer that, to the best of Seller's actual knowledge, each of the following is true as of the date hereof: . . . (b) The books, records, leases, agreements and other items delivered to Buyer pursuant to this Agreement comprise all material documents in Seller's possession or control regarding the operation and condition of the Property; . . . (e) There is no pending or threatened litigation which would adversely affect the Property or Buyer's ownership thereof after Closing; (f) There is no pending or threatened condemnation or similar proceedings affecting the Property, and the Property is not within the boundaries of any planned or authorized local improvement district; . . .

13. AS-IS. Except for those representations and warranties specifically included in this Agreement: (i) Seller makes no representations or warranties regarding the Property; (ii) Seller hereby disclaims, and Buyer hereby waives, any and all representations or warranties of any kind, express or implied, concerning the Property or any portion thereof, as to its condition, value, compliance with laws, status of permits or approvals, existence or absence of hazardous material on site,

occupancy rate or any other matter of similar or dissimilar nature relating in any way to the Property, including the warranties of fitness for a particular purpose, tenantability, habitability and use; (iii) Buyer otherwise takes the Property "AS IS;" and (iv) Buyer represents and warrants to Seller that Buyer has sufficient experience and expertise such that it is reasonable for Buyer to rely on its own pre-closing inspections and investigations.

. . . .

15. CONDEMNATION AND CASUALTY. Seller bears all risk of loss until Closing, and thereafter Buyer shall bear the risk of loss. Buyer may terminate this Agreement and obtain a refund of the earnest money . . . if condemnation proceedings are commenced against all or a portion of the Property before Closing. . . .

. . . .

21. DEFAULT AND ATTORNEY'S FEE. . . . Neither Buyer nor Seller may recover consequential damages such as lost profits.

CP at 54-69.

E.     Summary Judgment

LaClare filed a motion for summary judgment, arguing that (1) it made no misrepresentations, (2) there was no threat of condemnation, (3) there was no threatened or pending litigation, (4) there was no concealed material defect, (4) the books and records disclosed comprised all material documents, and (5) it did not negligently misrepresent the Property. LaClare also argued that summary judgment was appropriate because AVH had not asserted any recoverable damages.

Johnson also filed a motion for summary judgment. Johnson argued that (1) it owed no duty to the buyer or its assigns, (2) it met all duties of disclosure, (3) it had no duty to disclose readily ascertainable information, (4) the information was "quickly and easily" available to the buyer, (5) it committed no deceptive act or practice capable of deceiving the public under the

CPA, (6) it should not be held personally liable, (7) it did not violate the CPA, (8) it committed no deceptive act or practice, and (9) the undisputed facts establish no public interest impact. CP at 529.

AVH filed a motion for partial summary judgment. AVH argued that LaClare breached the PSA (1) by making affirmative misrepresentations and failing to disclose the threatened condemnation proceedings; and (2) by failing to provide documents and communications relating to Sound Transit's planned expansion project. AVH filed a reply in support of plaintiff's motion for partial summary judgment. AVH also filed a combined response to defendants' motions for summary judgment countering LaClare's and Johnson's arguments.

After orally granting Johnson's and LaClare's motions for summary judgment, the following exchange occurred between Johnson's counsel and the court:

> MS. FAUBION: One quick question, Your Honor. Defendant Johnson for full summary judgment on the negligent misrepresentation and CPA claims? Are you granting on both of those?
> THE COURT: Yes.

Verbatim Report of Proceedings (June 30, 2017) at 38-39. The superior court subsequently entered an order granting LaClare's and Johnson's motions for summary judgment and denying AVH's motion for partial summary judgment. The order reads,

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Defendant LaClare's Motion for Summary Judgment is hereby granted based only upon LaClare's argument that there are no recoverable damages for plaintiff's claims against LaClare and Plaintiff's claims against LaClare are dismissed with prejudice. It is further order[ed] that Plaintiff's Motion for Partial Summary Judgment is DENIED. It is further ordered that Defendant's Johnson [and] Johnson Commercial Properties motion for summary judgment is granted in full and plaintiff's claim against defendants Johnson and Johnson Commercial are dismissed with prejudice.

CP at 862-64.

11

No. 51001-4-II

AVH appeals the superior court's grant of summary judgment to Johnson.[8]

ANALYSIS

I. SUMMARY JUDGMENT

A.      Standards of Review and Legal Principles

We review an order granting summary judgment de novo. *Jackowski v. Borchelt*, 174 Wn.2d 720, 729, 278 P.3d 1100 (2012). In doing so, we may consider only the evidence and issues called to the attention of the trial court. RAP 9.12; *Kofmehl v. Baseline Lake, LLC*, 177 Wn.2d 584, 594, 305 P.3d 230 (2013).

Summary judgment is appropriate only if the moving party shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). "A party moving for summary judgment bears the initial burden of showing the absence of an issue of material fact." *Kofmehl*, 177 Wn.2d at 594. If a moving defendant has met its burden by showing that there is an absence of evidence to support the plaintiff's case, the burden then shifts to the plaintiff to come forward with sufficient evidence to establish the existence of each essential element of the plaintiff's case. *Howell v. Spokane & Inland Empire Blood Bank*, 117 Wn.2d 619, 624-25, 818 P.2d 1056 (1991). We construe the facts and draw all factual inferences in the light most favorable to the nonmoving party. *Kofmehl*, 177 Wn.2d at 594. Therefore, in reviewing the trial court's grant of summary judgment to Johnson, we construe the facts and draw all factual inferences in AVH's favor. *See id.*

---

[8] AVH does not appeal the grant of summary judgment to LaClare.

12

This case presents questions of statutory interpretation, which we review de novo. *Jackowski*, 174 Wn.2d at 729. The primary objective of statutory interpretation and construction is to determine and carry out the legislature's intent. *Id.* If possible, we derive legislative intent solely from the plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-12, 43 P.3d 4 (2002). When interpreting a statute we first look to its plain language. *Id.* If the plain language is subject to only one interpretation, our inquiry is at an end. *Id.* If, after consideration of all relevant statutory language, "the statute remains susceptible to more than one reasonable meaning, the statute is ambiguous and it is appropriate to resort to aids to construction, including legislative history." *Id.* at 12.

In its complaint, AVH alleged the tort of negligent misrepresentation and violations of the CPA against Johnson.

The burden of proof for negligent misrepresentation claims is clear, cogent, and convincing evidence. *Borish v. Russell*, 155 Wn. App. 892, 905 n.7, 230 P.3d 646 (2010); *Stieneke v. Russi*, 145 Wn. App. 544, 561, 190 P.3d 60 (2008). When reviewing a civil case in which the standard of proof is clear, cogent, and convincing evidence, we "'must view the evidence presented through the prism of the substantive evidentiary burden.'" *Woody v. Stapp*, 146 Wn. App. 16, 22, 189 P.3d 807 (2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Thus, we must determine whether, viewing the evidence in the light most favorable to AVH, a rational trier of fact could find that AVH supported its claim with clear, cogent, and convincing evidence. *See Woody*, 146 Wn. App. at

22. To overcome a presumption on summary judgment, AVH must offer evidence establishing a prima facie case supporting the claim or defense. *See id*.

Whether particular actions give rise to a violation of the CPA is a question of law that we review de novo. *Svendsen v. Stock*, 143 Wn.2d 546, 553, 23 P.3d 455 (2001).

B.   Negligent Misrepresentation:  All Existing Material Facts Known by Johnson Were Readily Ascertainable to AVH[9]

AVH argues the trial court erred when it granted summary judgment to Johnson and dismissed its negligent misrepresentation cause of action, because the Property was under a threat of condemnation or similar proceedings.  As part of this argument, AVH contends that RCW 18.86.030(1)(d) imposed a duty to disclose all existing material facts known by Johnson and not apparent or readily ascertainable to AVH.  Assuming, without deciding, that there was a threat of condemnation against the Property, and that RCW 18.86.030(1)(d) imposed a duty to disclose all existing material facts known by Johnson and not apparent or readily ascertainable to AVH, AVH's argument fails because all existing material facts known by Johnson were readily ascertainable to AVH.[10]

To prevail on a claim of negligent misrepresentation, the plaintiff must prove by clear, cogent, and convincing evidence that

(1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the

---

[9] AVH did not request relief under any separate claim of fraudulent concealment.  Rather, it brings its arguments of failure to disclose and concealment as parts of its claims of negligent misrepresentation and CPA violations.  We analyze them as such.

[10] The duties to disclose imposed by RCW 18.86.030(1)(d) are not the same as those required through the seller's disclosure statement for commercial property by RCW 64.06.013.  This appeal does not involve any claims based on the latter statute.

14

defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages.

*Ross v. Kirner*, 162 Wn.2d 493, 499, 172 P.3d 701 (2007). An omission by itself cannot constitute negligent misrepresentation, since the plaintiff must justifiably rely on a misrepresentation. *Id.* at 499. Nevertheless, if a party has a duty to disclose information, the failure to do so can constitute negligent misrepresentation. *See Van Dinter v. Orr*, 157 Wn.2d 329, 333, 138 P.3d 608 (2006). A person asserting negligent misrepresentation "'is held to the standard of care, knowledge, intelligence and judgment of a reasonable [person].'" *Condor Enter., Inc. v. Boise Cascade Corp.*, 71 Wn. App. 48, 51, 856 P.2d 713 (1993) (quoting RESTATEMENT (SECOND) OF TORTS, § 552 (1977)). "Thus, a plaintiff suing for negligent misrepresentation must prove that he or she justifiably relied upon information negligently supplied by a defendant." *Id.* at 52. "To date, the Washington cases also follow the Restatement view that justifiable reliance is equivalent to a lack of contributory negligence. As a result, contributory negligence is a complete bar to recovery, rather than a trigger that causes the fault of plaintiff and defendant to be compared and apportioned." *Id.* We can affirm summary judgment "'only if reasonable persons could reach but one conclusion from all the evidence.'" *Id.* at 54 (quoting *Hansen v. Friend*, 118 Wn.2d 476, 485, 824 P.2d 483 (1992)).

AVH argues that Sound Transit's interest in the Property was "not apparent or readily ascertainable" to AVH and, because Johnson had a duty to disclose information "not apparent or readily ascertainable" under RCW 18.86.030(1)(d), his failure to do so constituted negligent misrepresentation. We disagree.

RCW 18.86.030(1)(d) states that "the broker owes to all parties to whom the broker renders real estate brokerage services" a duty "[t]o disclose all existing material facts known by the broker and *not apparent or readily ascertainable* to a party." (Emphasis added.) The phrase "readily ascertainable" is undefined. We may use a general purpose dictionary to determine a phrase's plain meaning. *City of Spokane ex rel. Wastewater Mgmt. Dep't v. Dep't of Revenue*, 145 Wn.2d 445, 454, 38 P.3d 1010 (2002).

We adopt the plain language analysis of *WGW USA, Inc. v. Legacy Bellevue 530, LLC*, No. 72939-0, slip op at 192 Wn. App. 1002 (Wash. Ct. App.) (Dec. 28, 2015) (unpublished).[11] "Readily" means "with fairly quick efficiency: without needless loss of time: reasonably fast" or "with a fair degree of ease: without much difficulty: with facility." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1889 (2002). The same dictionary defines "ascertain" as to "find out or learn for a certainty (as by examination or investigation): make sure of: discover." WEBSTER'S at 126. Thus, information is readily ascertainable if the party could discover it quickly or easily.

Johnson provided undisputed evidence that all the existing material facts that AVH claimed he failed to disclose were a matter of public record. Gregg declared, for example, "The information provided to Mr. Johnson was available on the Sound Transit website." CP at 414. In *Central Puget Sound Regional Transit Authority v. Miller*, 156 Wn.2d 403, 415-16, 128 P.3d 588 (2006), our Supreme Court held that Sound Transit provided adequate notice of a public hearing on the selection of property for acquisition or condemnation by posting information on

---

[11] Http://www.courts.wa.gov/opinions/pdf/729390.pdf.

its website.  For that reason, we hold that there is no genuine dispute that the undisclosed information was *ascertainable*, that is, discoverable, if it is publicly available on a government website.  *See id.* at 415-16.

The question thus becomes whether the information was *readily* ascertainable.  AVH offers several reasons for its failure to investigate Sound Transit's potential impact on the Property, but none that address whether the information was *readily* ascertainable.  AVH's arguments appear to recognize that it could have found the information on Sound Transit's website, or other places, but did not do so because AVH's agents assumed that kind of due diligence would be difficult and time consuming.  AVH claims that it would have been "both unreasonable and unrealistic" for Moultrie or Ohayon to "scour through Sound Transit's website" because "it is not something buyers, or brokers do as an ordinary part of due diligence, or that they have time to do."  Br. of Appellant at 20-21.

However, AVH did not introduce any evidence about the difficulty (or ease) of independently discovering the undisclosed information at issue in this case with, for example, a simple Internet search or with some other means of inquiry.  In fact, AVH does not provide an interpretation or analysis of the term "readily" in relation to the facts of this case.  As the plaintiff, AVH has the burden to produce *some* evidence that the information was not readily ascertainable.  *See Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225-26, 770 P.2d 182 (1989).

Even though AVH has not put forth evidence showing whether all existing material facts known by Johnson were readily ascertainable, the record otherwise provides evidence showing that all existing material facts known by Johnson could have been readily ascertained.  For example, Gregg declared,

17

Prior to the adoption of Resolutions 2015-22 and 2016-02 Sound Transit engaged in substantial public outreach to inform the public about the options Sound Transit was considering for the Tacoma Link Expansion, including the OMF expansion. Our objective was to inform the general public in Sound Transit's planning process. For the Tacoma Link Expansion, this public outreach included publication of information and notices on Sound Transit's website and in newspapers, press releases, mass postcard mailing, mass emailing, notifications on list serves for professional and community organizations, multiple community meetings, and participation in fairs and festivals. The public information Sound Transit provided included maps depicting proposed locations and alternatives for the expansion project. The Tacoma Link Expansion also received ongoing news coverage throughout Sound Transit's planning process, including coverage by the Tacoma News Tribune and local television and radio news casts.

CP at 412. Thus, because of the breadth of information publically available, all existing material facts known by Johnson could have been *readily* ascertained if AVH or its brokers had exercised a minimal amount of diligence.

We are unpersuaded by AVH's argument that it had the right to rely solely on the affirmative representation in the PSA and had no duty to inquire further. AVH cites the following rule from *Rummer v. Throop* to bolster its argument:

"The rule is followed at the present time in practically all American jurisdictions, in respect to transactions involving both real and personal property, that one to whom a positive, distinct, and definite representation has been made is entitled to rely on such representation and need not make further inquiry concerning the particular facts involved. This rule is a corollary to the broad principle of a general right of reliance upon positive statements. Under this rule it is sufficient if the representations are of a character to induce action, and do induce it, and the only question to be considered in whether the misrepresentations actually deceived and misled the complaining party. Under such circumstances, it is immaterial that the means of knowledge are open to the complaining party, or easily available to him, and that he may ascertain the truth by proper inquiry or investigation."

38 Wn.2d 624, 633, 231 P.2d 313 (1951) (quoting *Cunningham v. Studio Theatre*, 38 Wn.2d 417, 424-25, 229 P.2d 890 (1951)).

18

*Rummer* involved fraud predicated on an intentional misrepresentation, not a negligent misrepresentation. *Rummer* observed that the buyer could have checked the deed at the county auditor's office, which made specific reference to the fact at issue. *Id.* at 634. The buyer, however, relied on the seller for the facts. *Id.* The court ultimately held that the buyer "may have been foolishly credulous in doing this, but that would not deprive him of the right to rely." *Id.* It noted, however, that the right to rely also "involves the question of [the buyer's] diligence in ascertaining the facts for himself . . . [and] his exercise of care and judgment in acting upon representations which run counter to knowledge within his possession or reach." *Id*. at 633.

Nevertheless, *Rummer* and *Cunningham* do not deal with the statutory duty of a broker "[t]o disclose all existing material facts known by the broker and not apparent or *readily ascertainable* to a party." RCW 18.86.030(1)(d) (emphasis added). More to the point, Johnson himself made no such "positive, distinct, and definite representation" in the PSA. Burrows, LaClare's principal, made all representations and warranties presented to AVH as the seller and signatory of the PSA. In fact, after AVH inquired about the Property, Johnson asked Burrows whether he should disclose Sound Transit's potential interest in the Property to AVH; Burrows directed Johnson not to do so. The seller's representations in the PSA do not equate to Johnson's representations as the seller's agent. Therefore, this argument fails.

AVH also cites *Bloor v. Fritz*, 143 Wn. App. 718, 733-34, 180 P.3d 805 (2008) to argue that "a broker cannot remain silent . . . any time that a known material defect is publicly available somewhere." Br. of Appellant at 16. *Bloor* involved a negligent misrepresentation claim based on a broker's failure to disclose methamphetamine contamination in a residence. 143 Wn. App. at 723. A local newspaper had published an article that law enforcement had

19

removed a methamphetamine lab from the property, and the plaintiffs were able to discover the house's history of drug manufacturing once they heard rumors that the house was known as a "drug house." *Id.* at 726, 733. Thus, the information was likely ascertainable before the plaintiffs purchased the house. However, because the defendant argued solely that he did not know about the defect, the court did not address whether the undisclosed information was readily ascertainable under the statute. *Id.* at 733-34. Accordingly, AVH's reliance on *Bloor* is inapposite in that the decision does not interpret the phrase "readily ascertainable" at issue in this case.

The circumstances of this appeal are markedly different. Sound Transit publicized its proposed expansion, including expansion of the OMF, through press releases, newspaper publications, its website, mass e-mailings, mass postcard mailings, multiple community meetings, and participation in fairs and festivals. In addition, Sound Transit had an obvious presence in the immediate vicinity of the Property, including tracks on one side and the OMF on the other. This information would cause a reasonably prudent person to inquire further, and such inquiry, reasonably and diligently pursued, would have easily revealed all existing material facts known by Johnson. AVH did not act in a reasonably diligent manner in light of the facts of this case. Because any amount of "contributory negligence is a complete bar to recovery" in a negligent misrepresentation action, AVH's challenge to summary judgment fails. *See Condor*, 71 Wn. App. at 51-54.

Construing the facts and drawing all factual inferences in the light most favorable to AVH, summary judgment was proper. Johnson met his initial burden of showing the absence of a genuine issue of material fact. AVH did not meet its burden to produce evidence raising a

genuine issue of material fact regarding whether the information about Sound Transit's planned expansion was "readily ascertainable." Accordingly, we hold the trial court did not err when it granted summary judgment to Johnson and dismissed AVH's negligent misrepresentation cause of action.

C.      Consumer Protection Act

AVH argues that Johnson committed unfair or deceptive acts under the CPA. We disagree.

Under the CPA, "unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. RCW 19.86.020. To prevail in a private claim under the CPA, a plaintiff must establish five elements: (1) unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) public interest impact, (4) injury to plaintiff in his or her business or property, and (5) causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986).

Our Supreme Court has held that "[w]hether a particular act or practice is 'unfair or deceptive' is a question of law." *Panag v. Farmers Ins. Co. of Washington*, 166 Wn.2d 27, 47, 204 P.3d 885 (2009) (quoting *Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 150, 930 P.2d 288 (1997)). Our Supreme Court has also held

> that a claim under the Washington CPA may be predicated upon a per se violation
> of statute, an act or practice that has the capacity to deceive substantial portions of
> the public, or an unfair or deceptive act or practice not regulated by statute but in
> violation of public interest.

*Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 787, 295 P.3d 1179 (2013).

Under the capacity-to-deceive test, "[a] plaintiff need not show that the act in question was *intended* to deceive, but that the alleged act had the *capacity* to deceive a substantial portion

of the public." *Hangman Ridge*, 105 Wn.2d at 785. The "knowing failure to reveal something of material importance is 'deceptive' within the CPA." *Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 162 Wn.2d 59, 75, 170 P.3d 10 (2007) (quoting *Robinson v. Avis Rent A Car Sys., Inc.*, 106 Wn. App. 104, 116, 22 P.3d 818 (2001)).

AVH cites *Griffith v. Centex Real Estate Corp.*, 93 Wn. App. 202, 215, 969 P.2d 486, *as amended on denial of reconsideration* (Dec. 14, 1998), *McRae v. Bolstad*, 101 Wn.2d 161, 162-65, 676 P.2d 496 (1984), and *Bloor*, 143 Wn. App. at 733-34, to argue that "Washington courts have repeatedly recognized a duty to disclose material facts in real estate transactions and imposed CPA liability in cases of failure." Br. of Appellant at 27-28.

In *Griffith,* 93 Wn. App. at 206, a group of residential buyers brought a class action lawsuit against the builder-vendor, alleging breach of express warranty, negligent misrepresentation, and CPA violations after paint began to peel off cedar siding on their homes. On appeal, we recognized that "[o]ur cases establish a general duty on the part of a seller to disclose facts material to a transaction when the facts are known to the seller but not easily discoverable by the buyer." *Id*. at 214. We held that a genuine issue of material fact precluded summary judgment as to the class's CPA claims. *Id*. at 215-18.

In *McRae,* 101 Wn.2d at 162-65, a residential buyer successfully prosecuted an action under the CPA when the sellers failed to disclose sewer and drainage problems. In holding that the claim satisfied the CPA's public interest element, the court determined that the seller's failure to disclose material facts about the property was an unfair and deceptive act or practice. *Id.* at 165-66. The court also recognized that the "failure of a salesman to disclose information has long been recognized as the basis for an action under RCW 19.86." *Id.* at 166.

*Griffith* and *McRae* are distinguishable because those cases did not interpret the limited duty of a broker under RCW 18.86.030(1)(d), which requires brokers "[t]o disclose all existing material facts known by the broker and *not apparent or readily ascertainable to a party*." (Emphasis added.) To the extent these decisions are applicable, *Griffith* noted in a CPA setting that the seller's duty to disclose known material facts arises when the facts are "not easily discoverable by the buyer." *Id*. at 214. *McRae*, in turn, focused on whether the public interest element of a CPA claim was met and did not go into how readily the buyer could discover the problem. 101 Wn.2d at 165-66.

In *Bloor*, 143 Wn. App. at 735-37, the seller's agent failed to disclose a known material fact to the buyer, a history of illegal drug manufacturing at the residence. We held the trial court did not err when it concluded the agent violated the CPA. *Id*. at 737. *Bloor*, however, did not address whether the undisclosed information was readily ascertainable under the statute. *Id.* at 733. Thus, it does not control the resolution of this appeal.

As noted, a CPA claim may be of a per se nature based upon a violation of statute, an act or practice that has the capacity to deceive substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute but in violation of the public interest. *Klem*, 176 Wn.2d at 787. In its complaint, AVH alleged that "Johnson . . . owed statutory duties to exercise reasonable skill and care, to deal honestly and in good faith, and to disclose all existing material facts known and not apparent or readily ascertainable to the plaintiff." CP at 8. This is a CPA claim of the first type.

As shown in the discussion of negligent misrepresentation, Johnson did not breach this statutory duty because the material facts known by Johnson were readily ascertainable. Thus, AVH's claim of a per se violation under the CPA fails.

AVH next argues Johnson committed an unfair or deceptive act when he presented the PSA to AVH's agents claiming there "were no pending or threatened condemnation or similar proceedings affecting the Property." *Id.* Similarly, AVH argues that because Johnson advertised the Property for sale to the public by listing it on the multiple listing service directory and placing a for sale sign on the Property, he knowingly failed to reveal something of material importance, Sound Transit's interest in the Property. According to AVH, Johnson's failure to disclose Sound Transit's interest in the Property had the capacity to deceive a substantial portion of the public and, in fact, deceived AVH. *Id.*

As set out more fully above, the PSA was executed on July 30, 2015. Among its seller's representations was the statement, "There is no pending or threatened condemnation or similar proceedings affecting the Property." CP at 58. The evidence shows that before this time Johnson knew of Sound Transit's interest in the Property and had communicated with the agency about a possible purchase. However, Sound Transit's representative stated that she did not tell AVH or Johnson that the agency would acquire the property or discuss terms of any potential purchase. Sound Transit's assertion is uncontroverted. Only on November 19 did Sound Transit formally select the Property for the OMF expansion through Resolution No. R2015-22. On January 28, 2016, Sound Transit adopted Resolution R2016-02 authorizing acquisition of the Property, including the option of condemnation. Thus, the uncontroverted evidence shows that

24

at the time the PSA was executed, there were no threatened or pending condemnation proceedings affecting the Property.

The question thus becomes whether Johnson acted deceptively in failing to disclose Sound Transit's interest in the Property to AVH. This issue does not depend on whether Johnson complied with RCW 18.86.030(1)(d), since that statute underlies only his claim of a per se CPA violation.

As described above, Sound Transit broadly publicized its proposed expansion, including expansion of the OMF, through public media, its website, mass mailings, and public events. As also noted, Sound Transit had an obvious presence in the immediate vicinity of the Property, including operating rail tracks on one side and the OMF on another. This information, taken together, would plainly convey to a reasonably prudent person that Sound Transit likely had interest in acquiring the Property.

In addition, Johnson's failure to disclose the interest of a neighboring property owner in purchasing the Property is far different than the seller's failure to disclose sewer and drainage problems in *McRae* or the agent's failure to disclose the history of methamphetamine production in *Bloor*. Although these cases involve defects to property, they supply guidance as to when the failure to disclose information is unfair or deceptive under the CPA. The failure to disclose a problem need not be as severe as those in *McRae* or *Bloor* to sustain a CPA claim. However, the failure to disclose another party's interest in possibly purchasing the Property, when that interest is clear from readily available information and the facts on the ground, is of another type entirely. Taking all the circumstances into account, Johnson did not act unfairly or deceptively by failing to disclose Sound Transit's interest in acquiring the Property.

25

For these reasons, we hold that Johnson did not commit unfair or deceptive acts under the CPA. Since private CPA plaintiffs must establish all five elements, the finding that the first element is not met is fatal to AVH's claim, and no other elements need be discussed. *See Hangman Ridge*, 105 Wn.2d at 793.

D.      Personal Liability

AVH argues that Johnson is personally liable for his torts and CPA violations. However, because we hold Johnson did not commit the tort of negligent misrepresentation or violate the CPA, he cannot be held personally liable.

ATTORNEY FEES ON APPEAL

AVH argues it is entitled to attorney fees, costs, and expenses incurred on appeal pursuant to RAP 18.1 and RCW 19.86.090. We disagree.

RAP 18.1(a) allows us to award attorney fees and costs on appeal "[i]f applicable law grants to a party the right to recover reasonable attorney fees or expenses." RCW 19.86.090 allows a person injured in his business or property by a violation of various CPA provisions to recover reasonable attorney fees and costs. *Mason v. Mortgage Am., Inc.*, 114 Wn.2d 842, 856, 792 P.2d 142 (1990). With our holding, AVH was not injured by a violation of the CPA. Therefore, AVH is not entitled to attorney fees on appeal under RAP 18.1 and RCW 19.86.090.

CONCLUSION

We hold that Johnson is not liable for negligent misrepresentation and did not violate the

No. 51001-4-II

CPA. Thus, we affirm and decline to award attorney fees to AVH.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Bjorgen, J.T.

We concur:

Worswick, P.J.

Johanson, J.